## ROGERS et al. v. ROOP.

Eastern Section. April 13, 1935.

Petition for Certiorari denied by Supreme Court, March 13, 1936.

580

Morse & Morse, of Knoxville, for appellant.
A. E. Mitchell, of Knoxville, for appellees.

PORTRUM, J.  This suit was filed by Charles F. Rogers to specifically perform a contract entered into between Rogers and the defendant J. B. Roop, for the exchange of certain real estate in the city of Knoxville.  There was no misunderstanding in reference to the consideration passing between the parties.  The defendant declined to carry out the contract solely upon the ground that the complainant had not complied with its terms by tendering a good and sufficient warranty deed conveying a marketable title.  The complainant tendered what he believed to be a marketable title evidenced by a warranty deed executed by him in a formal manner.  This title and the contract is before us, and we are to determine if the complainant has complied with the terms of the contract by tendering a warranty deed conveying a marketable title.  The contract reads as follows:

"Article of agreement, made this 28th day of October, 1933, between Charles F. Rogers, party of the first part, and J. B. Roop, party of the second part, witnesseth, that, if the party of the second part shall first make the payments and perform the covenants hereinafter mentioned on his part to be made and performed, the party of the first part hereby covenants and agrees to convey and assure to the said party of the second part, in fee simple, clear of all encumbrances whatsoever, by a good and sufficient warranty deed, with good marketable title in grantors, except as hereinafter provided, the lot, piece or parcel of ground, situated in Knoxville, Tennessee, known and described under house Number 1209 and 1211, Western Avenue, with improvements thereon.  It is mutually agreed

between the said parties that the consideration for said conveyance is to be $18,000 evidenced first by the conveyance to the said party of the first part by the party of the second part of the premises at 1123 Stewart Ave. in Knoxville, Tenn. at a price of $3,000, second by the assignment of a certain mortgage for $5,000 secured on property at 102 Alfred Street, in Alexandria, Va. the same to be accepted by the party of the first part from the party of the second part, at the sum of $5,000, third by the assumption by the party of the second part of a certain mortgage now on the premises conveyed from the party of the first part to the party of the second part, said mortgage being in favor of the Fidelity Bankers Trust Co. for the sum of $7,450.

"Under this agreement aforesaid there would be a balance due Mr. Rogers the party of the first part from the party of the second part the sum of $2,550 in full settlement. However the said party of the first part agrees to loan the said party of the second part $5,000 for three years due on or before maturity, making a net amount to him of $2,450 in addition to the balance of purchase price.

"Provided that all taxes and insurance and interest due or past due is to be prorated to the present date Oct. 28, 1933, and further at the closing of the contract of the loan as aforesaid the mortgage to Fidelity Bankers Trust Co. is to be paid and released. Provided also the rents on properties conveyed also be due respective purchasers from this same date.

"In witness whereof the parties of this agreement have hereunto set their hands this 28th day of October, 1933 at Knoxville, Tenn.

"[Signed] Charles F. Rogers
"[Signed] J. B. Boop

"Witness: C. A. Morse."

Rogers and Roop were first cousins, and Roop had known the property for many years; it having been in the Rogers family since 1912, in which year Rogers' father constructed a business building upon the property with two storerooms and business rooms upstairs. At the date of the contract, one of the storerooms was occupied by the Roberts' Drug Store, Roberts then being the owner of the encumbered property, and the other room was occupied by the A. & P. Tea Company, or a grocery store, and some of the rooms upstairs were occupied by tenants. When Dr. Roberts purchased this property, Roop expressed a desire for it and stated that he was sorry that he didn't know the property was being sold for he would have liked to have purchased it. When Dr. Roberts defaulted in the payment of his purchase-money notes and the property was to be foreclosed, Rogers wrote Mr. Roop, and due to this communication negotiations were entered into and culminated in the contract above quoted. In the meantime the property had been advertised for sale

under the trust deed, and it was understood that Mr. Rogers would buy in the property at the trustees's sale subject to the first mortgage held by the Fidelity-Bankers Trust Company, which sale was to take place on October 30, 1933, and that he would then deed the property to Roop subject to the Fidelity-Bankers Trust Company's first mortgage.

When Dr. Roberts purchased the property from the Rogers' heirs or from the Index Security Company, a Florida corporation, the stock of which was owned by Charles R. Rogers, he financed his purchase by this method: He was to take the absolute title to the property, and then procure a loan from the Fidelity-Bankers Trust Company in the sum of $8,000 secured by a trust deed upon the property as a first lien, and for the balance to execute a second trust deed securing the sum of $14,196 evidenced by two notes, one of $5,000 and the other of $9,196; the latter or last note being due six years from date. These papers were executed on the same date, but before the Fidelity-Bankers Trust Company would accept the trust deed and make the loan, it required a survey of the property to identify it with the title papers. These title papers call for lot No. 10 of Hannah W. Swann's addition to the city of Knoxville, which lot fronted 50 feet on Western avenue (formerly Asylum avenue) and ran back by approximately parallel lines 164 feet to an alley. A brick building covered the front of the lot and extended almost to the rear of the lot, but two wooden buildings were constructed on the rear of the lot and upon the line of the property with a passageway between them. When this survey was made, it was discovered that the building had been constructed 9 inches over on lot No. 11, leaving 9 inches to the west, or adjoining lot No. 9, unoccupied by the building. The Fidelity-Bankers Trust Company declined to make the loan because of this discrepancy, and for fear of complications. The company required a correction, and Dr. Roberts procured from Mr. Ellis, the owner of lot No. 11 and perhaps lot No. 9, and former owner of lot No. 10, a quitclaim deed conveying the 9 inches off of lot No. 11, and in exchange Dr. Roberts conveyed 9 inches off of his lot No. 10, and after the exchange of these deeds a new description was written into the trust deed securing the debt of the Fidelity-Bankers Trust Company; the trust deed was then delivered and the transaction closed. The complainant Rogers was then living in Florida, and he was not present and knew nothing of this discrepancy in the description, so his trust deed was never reformed to comply with the description as given in the first trust deed. He was ignorant of this encroachment at the time he entered into the contract with the defendant.

By arrangement the complainant Rogers came from Florida and Roop came from Norfolk to meet in Knoxville for the sale of this

property, and at this meeting this contract was executed, which was the 28th day of October, 1933; prior to this time there had been filed a general creditors' bill in the chancery court against Dr. Roberts to wind up his business as an insolvent business, but Rogers was not a party defendant and had no actual knowledge of the proceeding. This proceeding was superseded by an involuntary petition in bankruptcy filed by Roberts' creditors, but at the time Rogers knew nothing of this. And Roop had no knowledge of these proceedings.

The parties then returned to their homes to await the foreclosure, expecting to immediately return and close the deal by the transfer of deeds. In the meantime Roop was to employ a title expert to examine and report upon the title. The property was foreclosed by the trustee on October 30, and the complainant Rogers became the purchaser and was conveyed the property by the trustee. After November 1 the parties corresponded between Alexandria, Va., the home of Roop, and Jacksonville, Fla., the home of Rogers, and they fixed the 18th of November to meet in Knoxville and close the deal. On this date they met there, and went first to the office of A. E. Mitchell, Rogers' attorney, and there they discussed fully the terms of the agreement, and adjusted their mutual obligations under the agreement, and Roop was tendered certain releases to sign and to take to Virginia to procure his wife's signature, and also Rogers' deed to the property, and was expected to turn over $5,000 in cash which he had with him. He was satisfied with the arrangement, but declined to accept the deed and turn over the money until he had consulted his title expert, Mr. C. A. Morse. The parties then went around to the office of Mr. Morse, and he having discovered the 9 inches of encroachment upon lot 11 as above described and the pendency of the bankruptcy proceeding against Dr. Roberts, he questioned the right of the trustee to administer upon Dr. Roberts' estate while it was in bankruptcy and make the sale under the trust deed, and he declined at that time to approve the title. He suggested to Mr. Mitchell that the title be perfected first by procuring a release of the property from the bankruptcy proceeding, since there was no equity in favor of general creditors, next a quitclaim deed from Roberts, who had procured a quitclaim deed from Ellis, covering the 9 inches encroachment upon lot No. 11, and, lastly, that the property be readvertised and sold again under the trust deed. Mitchell thought it unnecessary to make a resale, but to satisfy the title expert who thought it advisable, he did again advertise the property for sale, and awaiting the perfection of this title the parties broke up and went to their homes. The property was advertised for sale a second time in the latter part of December, but about ten days before the date of sale, Roop, through his attorneys, Morse & Morse,

wrote Mitchell a registered letter, advising him that Roop would rescind the contract of sale and of his intention not to carry it out. Rogers was informed of this letter, and he wrote Roop insisting that he carry out the contract, but to no avail. The sale was again made, and this bill was filed the 1st of January, 1934, seeking to require Roop to perform his contract as he had agreed. Roop answered the bill and filed a cross-bill seeking a rescission. After a hearing the chancellor decreed in favor of the complainant, and the defendant has appealed.

The issues presented upon appeal may be classified as follows: (a) The plea of the statute of fraud; (b) the complainant fraudulently concealed the state of his title at the date of the contract; (c) the title is in fact defective and passes no estate because of the bankruptcy of Roberts at the date of the trustee's sale; (d) the title is not complete, because the deed tendered does not cover the entire tract contracted to be conveyed; (e) the title is not marketable and was not approved by the defendant's title expert.

■ (a) The property is described as "the lot, a parcel of ground, situated in Knoxville, Tennessee, known and described under house Nos. 1209 and 1211, Western Avenue, with improvements thereon." We think this description meets the statute of fraud.

■ "A description of the property by street and number is sufficient where the city in which it is located is stated, either in the caption or body of the instrument." 27 C. J., 271; Gage v. Cameron, 212 Ill., 146, 72 N. E., 204; Coates v. Lunt, 210 Mass., 314, 96 N. E., 685; Hilberg v. Greer, 172 Mich., 505, 138 N. W., 201.

■ "The number of a city lot is usually a sufficient description without specifying the boundary of the lot." Pomeroy, Specific Performance of Contracts (4 Ed.), section 2189, note 25.

■ The building referred to by numbers covered lot No. 10 of Swann's addition, and this lot is described in public records by metes and bounds, or by lineal measurement. This description may be applied with certainty to the designated tract, i. e., lot No. 10, and it is sufficient. Case v. Brier Hill Collieries, 145 Tenn., 1, 235 S. W., 57.

■ (b) We find no proof justifying the conclusion that the plaintiff fraudulently concealed the state of his title; he knew nothing of the encroachment at the time of the sale, or that 9 inches of Lot 10 had been conveyed away, and he was ignorant of the court proceeding declaring Dr. Roberts a bankrupt. We find that he acted in entire good faith, and he is not bound by constructive knowledge of the state of his title or the pendency of insolvency proceedings. Dixon v. Morgan, 154 Tenn., 389, 285 S. W., 558; Topp v. White, 12 Heisk., 165. To be guilty of fraudulent concealment, the complainant must misrepresent a fact either by his silence or statements when this fact is known to him or he is chargeable with notice due to his neg-

586

ligence. We think this rule is deductible from the case of Topp v. White, supra, and the many cases citing this case which are found in Shepherd's Tennesssee Annotations. We find that the complainant was as ignorant of the state of his title as was the defendant, and under such circumstances we conclude there was no fraudulent concealment.

(c) It is claimed that the title is defective and passes no estate for the reason that the trustee under the trust deed sold the property at a time when Dr. Roberts, who had executed the trust deed, had been declared a bankrupt and his estate was being administered in the bankruptcy court. There is no doubt but at the time of the trustee's sale the trustee acted at his peril, and that the title that he passed was voidable. Nothing more appearing, a court of equity would never specifically enforce a contract based upon this trustee's deed; but something else does appear, for at the suggestion of the defendant's title attorney, the trustee in bankruptcy released this property for the reason that he had no equity in it, with the consent of the bankruptcy court, since it entered an order of record reciting that creditors had no interest in the property and directing its release by the trustee in bankruptcy. With this adjudication in bankruptcy, the trustee's deed under the trust deed is no longer voidable but is valid. The case of In re Jersey Island Packing Co. (C. C. A.), 138 F., 625, 2 L. R. A. (N. S.), 560, is in point, and this case has been followed in a reported case by the Supreme Court of Tennessee, Hardcastle v. National Clothing Co., 137 Tenn., 64, 191 S. W., 524, where a conditional sales contract was enforced in the state court, notwithstanding the pendency of bankruptcy. In the above federal case the trustee was attempting to foreclose under a trust deed, when bankruptcy proceedings were instituted against the company, and the court lays down the law in reference to such a situation. It states that the trustee in bankruptcy has a right to refuse to take possession of mortgaged property if its value over encumbrances is not sufficient to justify an attempt to administer. It says that it is the trustee's duty to elect, with the approval of the court. And in the case of First Trust Co. v. Baylor (C. C. A.), 1 F. (2d), 24, 4 A. B. R. (N. S.), 643, it is held: That the trustee is not required to take over encumbered estate when nothing can be realized thereon, and he may, with the consent and under the direction of the bankruptcy court, abandon the mortgaged property, and the bankruptcy court may grant permission to the mortgage creditor to foreclose in the state courts. There is nothing to the contrary in the case of Isaacs, Trustee, v. Hobbs Tie & Timber Co., 282 U. S., 734, 51 S. Ct. 270, 75 L. Ed., 645.

(d) It is insisted that the deed tendered does not cover lot 10, contracted to be conveyed, and that equity will not enforce the

contract for this reason. The deed does not cover 9 inches on the west side of lot 10, but it does cover by way of substitution 9 inches on the east side conveyed off of lot 11. The defendant saw the building and knew exactly what he expected to purchase, and under this deed he received the property he intended to buy.

"Where a vendor is unable, from any cause not involving bad faith on his part, to convey each and every parcel of the land contracted to be sold, and it is apparent that the part which cannot be conveyed is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, in such case the vendor may insist on performance with compensation to the purchaser, or a proportionate abatement from the agreed price, if that has not been paid." James' Land & Investment Co. v. Vernon, 129 Tenn., 637, 644, 168 S. W., 156, 157, 52 L. R. A. (N. S.), 959.

The 9 inches on the east compensates for the loss of the 9 inches on the west, and the defendant's enjoyment and use of the property is in no way interfered with.

█ (e) Is the title merchantable—"marketable"—and was the expert examiner's disapproval justified? We think the title as tendered at the date of the filing of the bill was a title free from serious defects, evidenced by public record and in no way dependent upon parol evidence, and that nothing appears casting a cloud upon it from which litigation can arise; therefore we are of the opinion that the title is merchantable.

█ "Every purchaser should have a title which shall enable him not only to hold his land, but to hold it in peace, and if he wishes to sell it, to be reasonably sure that no flaws and doubts will come up to disturb its marketable value. But a threat of even the possibility of a contest will not be sufficient. The doubt must be considerable and rational, such as would and ought to induce a prudent man to pause and hesitate; not based on captious, frivolous, and astute niceness, but such as to produce real bona fide hesitation in the mind of the Chancellor." Pomeroy's Equity (4 Ed.), vol. 5, sec. 2223.

█ There were serious defects in the title when first tendered, but these were removed at the suggestion of the title examiner employed by the defendant, and the title was perfected at the date of the filing of the bill.

"It has been held in a case where rescission was asked upon the ground of a defective title the vendor would be allowed a reasonable time to perfect his title, and, if the after-required title be a good one, and there is no fraud, the complainant will be compelled to accept it. Baker v. Shy, 9 Heisk. [85], 89." McElya v. Hill, 105 Tenn., 319, 331, 59 S. W., 1025, 1028.

The title examiner was justified in declining to approve the title when first tendered, because of the trustee's sale while the mortgagor

was in bankruptcy and because the deed then tendered covered lot 10 and the building encroached 9 inches upon lot 11 which was owned by a third party, and this defect was fruitful of litigation; but the examiner only tentatively disapproved the title and suggested steps to remedy it, which were followed, as is often the case. This is equivalent to approving the title when the suggested defects are remedied, in the absence of the discovery of other defects. But the defendant cannot escape even if his examiner disapproved the title in case it is shown that the title is good and merchantable.

"The general rule is that specific performance is a matter of sound judicial discretion and in the exercise of judicial discretion the court will take into consideration all the facts and circumstances as well as the nature and character of the transaction, and if it appear that the ends of justice and equity will be best served by requiring specific performance of the contract, the court, exercising its discretion should decree a specific performance of the contract." Tennessee Cotton Growers Association v. Hanson, 2 Tenn. App., 118.

"Specific performance of a contract is a discretionary remedy requiring a legal and not arbitrary discretion, and is given as a substitute for a legal remedy of compensation whenever the legal remedy is inadequate or impracticable." New River Lumber Co. v. Tennessee Railway Co., 136 Tenn., 661, 191 S. W., 334.

In this case the parties in interest were all satisfied with the terms of the agreement, and the hitch was the defect in the title; we know of no reason why a court of equity should permit the defendant to escape the obligation of his contract, willingly, knowingly, and understandingly entered into, since the defect in the title complained of has been cleared away. The property was worth the price given at the time of the transaction, and the depreciation of the price since, if any, is no excuse for a court to decline to enforce the agreement. By the standards of fair dealing the defendant should now be willing to carry out his contract, and the court will not aid him in breaching it, but will specifically perform it. However, the questions presented in this case were difficult, and we cannot say it was not the act of a prudent man to require an adjudication upon them prior to the performance of the contract. This being true, we think this litigation is to the mutual interest of both parties and that the costs of the cause should be borne equally.

And we are further of the opinion that the adjustment of the mutual account between the parties should be made as of the date of the filing of the bill, or at least the date the receiver in bankruptcy turned over possession of the building, for these reasons: The defendant went info the possession of the building and collected a part of the October and November rents, aggregating more than $200, and upon advice of counsel he paid this rent over to the trustee

in bankruptcy who applied it upon Dr. Roberts' general debts. Up until the order in bankruptcy releasing this building, the trustee in bankruptcy was entitled to collect the rents on the building. "A trustee in bankruptcy will also be entitled to collect and receive the rents of mortgaged property of the bankrupt, at least until the mortgagees shall have taken proper steps to secure their application on his debt." Black on Bankruptcy, section 325. And the evidence reflects an agreement with the trustee in bankruptcy to permit him to occupy the drug store pending the disposition of the stock of goods, and until the trustee in bankruptcy relinquished possession, the complainant was disabled from delivering possession to the defendant, and certainly during this period the defendant should not be charged with these rents, which were in fact applied to the legal purpose the law fixed; the complainant was not entitled to the rent after bankruptcy and until the property had been released by the bankruptcy court, and the defendant should not be chargeable with the rent until the property was vacated by the trustee in bankruptcy. The record does not show just when this was. For this reason we say the adjustment should be made as of January 1, 1934.

The chancellor required the defendant to execute the deed he had contracted to execute, and make the transfers he agreed to make, and this is assigned as error, insisting that the title should have been vested and divested by the decree. The method followed is more beneficial to the defendant than the method suggested, and since the defendant's wife was not required to execute the papers, she not being a party, we can find no prejudicial error to the defendant in the course followed. As above modified, the decree of the lower court is affirmed, and the case remanded to that court for the enforcement of the decree as entered, with the modification above indicated. The cost of the cause to date is divided equally.

Ailor and McAmis, JJ., concur.