IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 27, 2014 Session

## SANDRA LYNN HOBBS v. LISA HOBBS NOTTINGHAM, ET AL.

**Appeal from the Chancery Court for Sullivan County (Kingsport)**
**No. K0034810(M)     John S. McLellan, III, Chancellor**

---

**No. E2013-002602-COA-R3-CV-FILED-JANUARY 30, 2015**

---

The quasi-parties in this matter had their bids accepted at a judicial sale, but they failed to carry out their purchases and close on the properties. After a re-sale was conducted, the trial court charged the quasi-parties with the difference between the amount of the original bids and the amount received for the properties at the re-sale. They were also assessed the expenses resulting from the re-sale. The quasi-parties appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Christopher D. Owens, Johnson City, Tennessee, for the quasi-parties/appellants, David L. Rose and J. Rickey Davis.

Thomas H. Torbett and Thomas A. Peters, Kingsport, Tennessee, and Ronald W. Woods and Brandy M. Burnette, Greeneville, Tennessee, for the appellees, Sandra Lynn Hobbs and Lisa Hobbs Nottingham.

## OPINION

### I. BACKGROUND

The appellants in this action, David L. Rose and J. Rickey Davis, are quasi-parties in a partition action among the heirs of Herbert Hoover Hobbs, who died intestate in 1998. In filing the partition action in 2006, Sandra Hobbs, Mr. Hobbs's daughter, asked the trial court to sell the properties held by her father at his death. The defendants were the other heirs of

Mr. Hobbs: Lisa Hobbs Nottingham (another daughter), and Gwendolyn B. Hobbs (widow) (along with Sandra Hobbs, collectively "the Hobbses"). When the Hobbses were unable to agree on how to divide the estate, the trial court ordered the sale of the real property and appointed Sara Housewright (the Clerk and Master at that time) to serve as "Special Commissioner" to conduct the sale with the assistance of auctioneers.[1]

Several auctions of the estate property eventually were conducted in September 2009, including the Country Joy Apartments ("the Apartments") and the Country Joy Mobile Home Park ("the Park"). On September 18, 2009, Rose and Davis were the high bidders for the Apartments, "493 Barnett Dr., Kingsport, TN." The auction announcement released by Ron Ramsey & Associates, inter alia, provided that "[t]he seller will furnish a warranty deed to the property, free and clear of any liens. . . ." The "terms" set out in the sales contract called for cash payment, with a 10 percent deposit, the balance due "at closing in approx. 30 days" with the sale "subject to terms in announcement and court approval." The contract further provided that if "purchasers fail to carry out and perform the terms of this agreement after deed is presented, then the above deposit money shall be forfeited as a damage to this sale . . . ."

The Park, located at "483 Barnett Dr., Kingsport," was also auctioned on September 18, 2009. Initially, Kimberly Mason (through Kimberly Cantrell Investments, Inc.) was the high bidder on that parcel. On the day of the auction, she signed an identically worded contract to the one signed by Rose and Davis.

According to Rose and Davis, it had been represented to them at the auction that the Apartments and the Park were each separate parcels of land. They contacted Tom Peters, co-counsel for one of the Hobbses, to ask further questions. It appears that because the Apartments and the Park were on a single, undivided, unpartitioned parcel, Mr. Peters purportedly advised them that it would be easier if they upped their bid on the Park and purchased it as well.[2] Rose understood that purchasing the Park "may eliminate a lot of issues." The bid on the Park was raised by Rose and Davis on September 28, 2009, and ultimately they became the high bidder for it. They signed a sales contract for the Park on October 23, 2009. Earnest money in the amount of $12,375 was paid for the Park and $31,500 was paid for the Apartments.

In October 2009, Rose and Davis initiated efforts to obtain financing from BB&T.

---

[1]The Special Commissioner signed the contract as the seller and as the individual approving the contracts. The Hobbses were neither signatories nor parties to the contracts.

[2]The access to the Apartments from Barnett Drive is through the Park.

Rose's deposition testimony, used at trial for impeachment purposes, was that his lender wanted a survey completed and that he spoke with surveyor John Mize before he signed the contract for the Park on October 23, 2009. During the following week, he took Mr. Mize to see the property. Around this time, the Special Commissioner filed her report detailing the sales from the September auctions. The trial court confirmed the sales through an order effective December 16, 2009 (entered nunc pro tunc on January 4, 2010). According to Rose and Davis, they were not given notice of the confirmation hearing.

According to Rose and Davis, it was not until around March or April 2010, when they received the survey from Mr. Mize, that they finally understood the Park and the Apartments were not two separate parcels but rather the single, undivided parcel. Furthermore, the initial survey revealed that the driveway leading across the Park to the Apartments apparently encroached on other property retained by the Hobbs estate.[3] According to Rose, he advised the Special Commissioner, while Davis advised Mr. Peters regarding these issues. Thereafter, a revised survey was prepared that showed the property just purchased included the 14-foot parcel on which the driveway purportedly encroached. The survey and the legal description of the Apartments and the Park was in essence the same survey and legal description found in Tax Map 091, Parcel 103.00.

Tentative closing dates of April 22, 2010, and June 22, 2010, were set, but Rose and Davis never closed on their purchases. Motions for issuance of show cause orders were filed in August 2010. By the time the motions were heard the following month, nearly one year had transpired since the auctions. At the September 2010 hearing, Davis appeared with counsel and indicated he could close on the purchases in two weeks. He notified the court that he had "bought out" the interests of Rose. However, during the hearing, Davis did not inform the court regarding the issues he purportedly raised with Mr. Peters before signing the sales contract for the Park. Nor did he apprise the court of any concerns and/or ask the court for relief. Instead, he signed amended sales contracts – identical to the previous contracts except Rose was not a signatory – on September 20, 2010, for both the Apartments and the Park. Shortly thereafter, Davis initiated efforts with Tri-Summit Bank to obtain financing as the sole purchaser for the properties.

According to Davis, shortly after signing the amended contracts, he learned the underwriting guidelines had changed and that a ten percent deposit was no longer sufficient; rather, lenders were requiring a twenty percent deposit. Moreover, Davis was displeased with the fact that one lender would have required him to provide collateral in the form of other real property, in addition to the Apartments and the Park themselves, in order to secure

_____

[3]At the May 2012 hearing, the trial court found that the surveyor informed Rose about a possible encroachment of the driveway on an adjacent 14-feet parcel between October 6 and 23, 2009.

the loan. Davis admits he lost interest in purchasing the properties at this point.

In January 2011, another motion for issuance of a show cause order was filed by the Hobbses. The motion was heard on February 18, 2011, but neither Rose nor Davis appeared. The court thereafter issued show cause orders requiring the pair to appear on February 28, 2011. Rose and Davis further were directed to advise the court by March 18, 2011, whether they were willing to close on the properties.

On April 7, 2011, over 18 months after the date Rose and Davis executed the first sales contract, they moved to set aside the contracts on the Apartments and the Park. In the motion, they noted inter alia:

> Rose and Davis later learned that the property was a single tract and that they would have to acquire a right-of-way across 483 Barnett Drive to access 493 Barnett Drive;
>
> To avoid potential litigation and/or planning commission problems in that regard, Rose and Davis signed a contract on 483 Barnett Drive . . . ;
>
> * * *
>
> At the time the contracts were signed the property was the subject of a large federal tax lien;
>
> The tax lien was not paid until February 18, 2010 . . . ;
>
> Upon information and belief, the tax lien was not released until the spring of 2011;
>
> Thus, the property was not free and clear of liens for nearly 18 months after the contracts were signed, a material breach of the express terms of the contracts;
>
> On December 31, 2009, an Order of Confirmation of sales went into effect:
>
> Upon information and belief, neither Rose nor Davis were given notice of the hearing on the Order of Confirmation;

-4-

On September 20, 2010, an Amended Sales Contract was signed by Davis . . . and approved by the Clerk and Master . . . ;

This sale has not been approved by any subsequent Order of Confirmation, which is, respectfully, required . . . and because no notice of the hearing was provided [previously] calls into question whether any of the contracts are subject to the Order of Confirmation;

In addition, Davis'[s] inquiries as to financing have met resistance due to no fault of his own . . . ;

In any event, a closing on the property at issue was impossible prior to the removal of the tax lien, which was no fault of either Rose or Davis, and the passage of time since the contracts were signed is so significant that the circumstances regarding the condition of the property and the conditions of financing are such that Rose and Davis should be relieved of any obligation to purchase the property and their earnest money returned;

(Numbering in original omitted.). The pair later supplemented their motion to set aside the sales contract inter alia as follows:

The "contract[s]" for the sales of "483" and "493 Barnett Drive" are unenforceable, void and/or voidable pursuant to T.C.A. 29-2-101;[4]

The "contract[s]" for the sales of "483" and 493 Barnett Drive" are unenforceable and void due to the insufficiency of a description of what was "sold," *Baliles v. Cities Serv. Co.*, 578 S.W.2d 621 (Tenn. 1979); *Pipkin v. James*, 20 Tenn. 325 (1839);

It is undisputed that there are two "contracts" of sale to two "parcels" of property to two different parties that is in fact a single undivided tract of property;

---

[4]Statute of Frauds.

It was at the time of "sale" and, upon information and belief, is currently impossible for anyone, surveyor or otherwise, to create a property description of the "parcels" "sold" on September 18, 2009, October 23, 2009 or September 20, 2010[] . . . ;

There is no partition line between the "parcels" thus there could not have been a meeting of the minds as to what was "bought" or "sold" as no one to this day has any idea what the boundaries of the "parcels" are;

The parties to the "contracts" . . . cannot have a partition line imposed upon them "post-contracting" as such a partition would create an "estate of property" that was not bargained for;

At the current time a deed comporting with T.C.A. 66-5-103 cannot be created as to the contract . . . because under Tennessee law, [an] instrument conveying [an] interest in real property must designate land involved with reasonable certainty; [the] test is whether a surveyor with [the] instrument before him can locate the land and establish its boundaries, *In re Tennessee Gas Transp., Inc.*, 169 B.R. 643 (1994);

The "driveway" that ostensibly leads to the "Country Joy Apartments" is not contained with the source deed to the single tract and encroaches on an adjoining tract creating a cloud on title under threat of probably litigation.

(Numbering in original omitted.).

The hearing on the motion to set aside the sales contracts was held on May 24, 2012. On July 17, 2012, the trial court entered an order denying the motion, providing as follows:

That after the September 18, 2009 auction where Davis and Rose executed the Sales Contract for Country Joy Apartments, they subsequently agreed to also purchase the Country Joy Mobile Home Park for $120,000.00 from a previous auction purchaser and voluntarily entered into that contract of purchase on October 23, 2009 (Exhibit 20).

That Rose, incident to a request of BB&T Bank, had a March 2, 2010 survey of the approximate four acre parcel done which was revised April 8, 2010 for

the "inclusion of a 14' strip" (Exhibit 5).

That during the course of the September 2010 hearings, Davis met with the attorneys and advised he bought out Rose and would buy the Country Joy Apartments and Country Joy Mobile Home Park individually and advised Plaintiffs' attorneys he could close in two weeks.

That by purchasing Country Joy Mobile Home Park, purchase concerns about lack of a boundary line between the two parcels and right-of-way issues w[ere] eliminated.

That between September 18, 2009 and February 28, 2011, Davis, as the sole purchaser, for approximately eighteen months, filed no Motion nor request to be relieved from his purchase contracts.

Davis's concern of the I.R.S. lien was resolved when the Clerk and Master satisfied that lien on February 8, 2010 by Court Order directing the Clerk and Master to secure the release of any claim of the Internal Revenue Service with regard to estate taxes due from the Herbert Hoover Hobbs estate and directing Clerk and Master to deliver to purchasers a Deed conveying the tract of land free of any claim or lien listed on Exhibit A from purchase monies. . . .

As previously noted, it is the custom of the Clerk and Master to satisfy any liens and other deficiencies from the proceeds of sale so that as a matter of law title need not be free of defects at the time the contract is made as long as title is freed of defects at the time conveyance is due.

That incident to Davis and Rose's efforts to obtain financing for the purchase of Country Joy Apartments and Country Joy Mobile Home Park and preparation of a survey by John R. Mize, at the bank's request, a legal description of the properties was prepared, title examination was conducted, a title commitment was issued, and a closing date of June 22, 2010 was set.

That after Rose agreed that Davis would become the sole owner of the two parcels, Davis secured a pre-qualification commitment from BB&T for $500,000.00, however, after the September 20, 2010 hearing, Davis lost interest when the bank requested a 20% down payment due to a change in underwriting guidelines (instead of 10% down payment) and Davis did not want to secure the loan by tending two of his other commercial properties.

* * *

Both Rose and Davis understood that the Sales Contract which they entered into would be subject to confirmation by the Court.

*That Rose and Davis did not seek to be excused from their bid until April 7, 2011, approximately eighteen months after entering into their Sales Contracts for the two parcels.*

*That by appearing in September 2010 and representing to the Court that he purchased out the interest of Mr. Rose and would close in two weeks, Davis has waived any arguments regarding any other alleged deficiencies to title and procedure.*

*Davis's issues concerning marketability of title or access are of no consequence as he obtained a loan commitment from BB&T, Title Insurance Binder from Tri-City Title Company, Inc. and a date for closing the property in June, 2010.*

A bidder who has offered a highest bid at a judicial sale and a property is struck off to him and who refuses to comply with the terms of sale, is liable for the deficit resulting from the second sale, without some legal excuse. If a bidder has a reasonable and legal excuse for being relieved from compliance with the terms of sale, it is his duty to immediately seek relief by properly petitioning the Court thereof, *Matthews v. Eslinger*, 292 SW2d 543, 549 (Tenn. Ct. App. 1955).

(Numbering in original omitted. Emphasis added.). Rose and Davis were given 14 days to decide whether to purchase the properties or to risk the imposition of damages upon re-sale. The trial court directed the Special Commissioner to re-sell the Apartments and the Park if Rose and Davis refused to close on their contracts. In the event of re-sale, the court observed that a hearing would be held to consider whether Rose and Davis should be required to pay the associated damages resulting from the re-sale.

On July 31, 2012, a response was filed that indicated Davis "agrees to honor strict compliance with the terms and conditions of a certain Amended Sales Contract dated September 20, 2010." The pleading further provided "[t]his foregoing representation hereby renders any issues relating to David L. Rose moot." Davis thereafter filed motions to produce separate deeds. On August 16, 2012, the Special Commissioner delivered two proposed deeds that established a dividing line between the properties to Davis's counsel, but

since that production, she was not asked to set a closing date.

On October 5, 2012, the Hobbses filed yet another motion for issuance of a show cause order. At that time, Rose and Davis, through counsel, represented that Davis's financing efforts were ongoing and that the closing should take place in 45 days. Also at this hearing, for the first time, the court was expressly informed that Davis requested the property to be subdivided into two separate parcels. The court noted, in response to the motions to produce deeds, that the Special Commissioner had furnished already two proposed deeds so as to establish a dividing line between the Apartments tract and the Park tract. The court directed Rose and Davis to advise the court by October 26, 2012 if they refused to close on their purchases. Davis was informed that "the question of whether underwriting can be successfully completed in order to close on the purchase . . . as two separate parcels shall not serve as a basis to relieve Mr. Davis and Mr. Rose of their contractual obligations." The court thereafter received notice from Davis's counsel indicating as follows:

> [D]ue to the uncertainties as to whether the properties auctioned as Country Joy Mobile Home Park and Country Joy Apartments can receive underwriting approval as separate parcels, and that Mr. Davis does not desire to purchase the trailer park and apartments as a single tract due, in part, to Sullivan County Road Frontage Access Subdivision Regulations, Mr. Davis has elected to forego purchasing the auctioned properties.[5]

After receiving the formal refusal, the trial court directed the Special Commissioner to resell the properties. The court specifically declared that the re-sale was to be held at the risk of Rose and Davis and that, after the re-sale, a hearing would be held to ascertain whether they should be held responsible for damages. A court partition survey was then prepared and filed with the court before the re-sale. The property was partitioned into two parcels – Parcel Two, the Apartments and Parcel One, the Park. The re-sale was held on April 6, 2013, and confirmed by the trial court. Although the properties had been subdivided by the time of the re-sale and the deeds describe the Apartment tract separately from the Park tract, the properties were collectively bid on and purchased as a whole.

Hearings were held on September 18 and October 17, 2013 on the issues of whether Rose and Davis should be required to pay as damages the costs associated with the re-sale

---

[5]Counsel observes in an exchange with the court that the reason Davis and Rose did not desire to purchase the property as one parcel was because they would then have to appear before the zoning commission and would be required to have 50-foot road frontages. Counsel remarked, "It changes the whole complexion of this scenario. . . . [T]hey could have the Chancery Court Sale and avoid all that."

and the deficiency between their original bids and the high bid at the re-sale. Ultimately, the court entered a judgment against Rose and Davis in the amount of $125,645. This amount represents the difference between their 2009 bids and the 2013 bid at the re-sale ($114,250), plus the costs incurred during the 2013 re-sale ($55,270), with a credit for the deposits tendered by Rose and Davis in 2009. A timely notice of appeal was filed.

## II. ISSUES

We restate the issues raised on appeal by Rose and Davis as follows:

1. Whether the trial court erred in failing to set aside the sales contracts dated September 18 and October 23, 2009, and September 20, 2010.

2. Whether the trial court erred in imposing damages for the costs of the re-sale of the properties subject to the above dated sales contracts.

## III. STANDARD OF REVIEW

Our review of the trial court's conclusions of law is de novo with no presumption of correctness. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). The same standard applies to the trial court's application of law to the facts. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). With regard to the trial court's factual findings, we presume they are correct but will overturn them if we find that the evidence preponderates against them. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984).

## IV. DISCUSSION

### Confirmation

Rose and Davis assert that the contracts on the properties were void due to a lack of notice of the confirmation hearing as to the 2009 contracts, and because there was no confirmation of the 2010 contracts. They rely on our opinion in *Hollow v. Ingram,*[6] wherein we noted inter alia:

---

[6]Westlaw improperly spells "Ingram" as "Ingrim." We use the proper spelling as indicated in the court record.

In Tennessee, a high bidder at a judicial sale is considered a quasi-party to the proceedings and is subject to the jurisdiction and powers of the court, and is entitled to notice of all proceedings thereafter which affect the purchase and title, and is subject to all actions of the court subsequently taken in the cause. *Matthews v. Eslinger*, 292 S.W.2d 543 (Tenn. Ct. App. 1955); *Allen v. East*, 63 Tenn. 308 (1874). The high bid may subsequently be rejected by the court if the court refuses to confirm the sale, but if the court confirms the sale the high bidder may be forced to go through with the sale at that point. *Id.* Thus, the high bidder becomes a part of the subsequent proceedings which affect the purchase, and, as the Trial Court herein found, he would have the right to seek intervention and participate in the proceedings below.

. . . [O]nce the Special Master filed his report regarding this sale, the Court was required to act upon the same, and should have held a hearing specifically regarding whether the report should be confirmed and then made his independent decision on that issue. In Tennessee, Tenn. R. Civ. P. 53.04(2) discusses Special Master reports in non-jury actions, and states that "the court shall act upon the report of the master. Within ten (10) days after being served with notice of the filing of the report, any party may serve written objections thereto upon the other parties. . . ."

*Hollow v. Ingram*, No. E2010-00683-COA-R3-CV, 2010 WL 4861430, at *5 (Tenn. Ct. App. Nov. 29, 2010). Rose and Davis argue that the amended sales contracts dated September 20, 2010, superseded the previous contracts that were "confirmed," and thus would not be subject to the prior order of confirmation. Because the superseding contracts were never confirmed, Davis contends that he could not be compelled to complete the purchase.

If Rose and Davis were truly concerned about being heard at the confirmation hearing, they could have checked the court file or filed a motion with the court asking to be notified of any further proceedings. Davis was asked at the May 2012 hearing whether he had asked anyone when the trial court would confirm the sale and his response was, "No, I just went through [Rose]." Rose acknowledged having conversations with the Special Commissioner after the September 2009 auction, but admitted that he did not ask when the court sale would be confirmed. There was sufficient time between the auction and the confirmation to learn the hearing date and seek the aid of the court regarding the issues now described as "deal breakers." However, for over 18 months after the auction, the pair never came before the court requesting relief. They only appeared in response to the motions filed by the Hobbses. Under Tennessee law, a high bidder at a judicial sale of real property has the duty to act promptly if he wishes to be excused from the obligation to purchase real estate. *See Matthews v. Eslinger*, 292 S.W.2d 543, 549 (Tenn. Ct. App. 1955). Thus, Rose and Davis

-11-

were required to immediately bring to the court's attention any legal reason to excuse them from complying with the sales contracts. *Id.* It has long been a maxim and principle of equity that "equity aids the vigilant, not those who sleep upon their rights. . . . Equity delights in diligence, and is slow to aid the slow. It not only requires clean hands and a pure heart, but also swift feet." Henry R. Gibson, et al., Gibson's Suits in Chancery § 25 (6th ed.1982). Accordingly, in our view, Rose and Davis waived their rights to complain of not receiving notice of the confirmation hearing. We therefore find any reliance on *Hollow* regarding notice unavailing.

Furthermore, the 2010 sales contracts, executed by Davis merely because Rose desired to assign his interests in the properties, contained the same terms as did the 2009 contracts executed by both Rose and Davis. The decision in *Spicer v. Kimes*, 156 S.W.2d 334, 337 (Tenn. Ct. App. 1941) (recognizing the validity of an assignment of property interests after a court sale) reveals that there was no need for the 2010 contracts executed by Davis to be re-confirmed by the trial court in order for them to constitute enforceable agreements.

## Incapable of Legal Description

Rose and Davis argue that the land being sold as two separate parcels, when in fact there was only one parcel to sell, makes the property as sold incapable of legal description. Because there was no partition line between the properties, they assert there could not have been a meeting of the minds as to what was "bought" or "sold." Tenn. Code Ann. § 66-5-103; *In re Tennessee Gas Transport, Inc.*, 169 B.R. 643 (1994). They argue that the sales contracts they signed were void under the Statute of Frauds and that a material breach of contract occurred relieving them of any obligation to close on the parcels.[7]

---

[7]The Statute of Frauds, codified as Tennessee Code Annotated section 29-2-101, provides as follows:

(a) No action shall be brought:

> (4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year;

> unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. In a contract for the sale of lands, tenements, or hereditaments, the party to be charged is the party against whom enforcement of the contract is sought.

Tenn. Code Ann. § 29-2-101(a).

To be valid, a deed "must designate the land intended to be conveyed with reasonable certainty." *Phoenix Mut. Life Ins. Co. v. Kingston Bank & Trust Co.*, 112 S.W.2d 381, 382 (Tenn. 1938). "A description of the property by street and number is sufficient where the city in which it is located is stated, either in the caption or body of the instrument." *Rogers v. Roop*, 92 S.W.2d 423, 427 (Tenn. Ct. App. 1935). "The number of a city lot is usually a sufficient description without specifying the boundary of the lot." *Id.*, quoting Pomeroy, Specific Performance of Contracts (4th Ed.) § 2189. As noted in *Baliles v. Cities Service Co.*,

> to comply with the statute of frauds, a memorandum of an agreement to sell must show, with reasonable certainty, the estate intended to be sold.

> "Where the instrument is so drawn that upon its face it refers necessarily to some existing tract of land, and its terms can be applied to that one tract only, parol evidence may be employed to show where the tract so mentioned is located. But, where the description employed is one that must necessarily apply with equal exactness to any one of an indefinite number of tracts, parol evidence is not admissible to show that the parties intended to designate a particular tract by the description."

*Id.*, 578 S.W.2d 621, 623 (Tenn. 1979) (citing and quoting *Dobson v. Litton,* 45 Tenn. 616 (1868)).

Each contract designated the properties as "Country Joy Apartments, 493 Barnett Dr., Kingsport, TN" and "Country Joy Mobile Home Park, 483 Barnett Dr., Kingsport, TN." Each description of the property being sold clearly pertained to only one tract. As noted above, "[a] description of the property by street and number is sufficient where the city in which it is located is stated, either in the caption or body of the instrument.'" *Rogers*, 92 S.W.2d at 428. We agree with the trial court that the description satisfies the Statute of Frauds.

Further, as of October 23, 2009, Rose and Davis were purchasing the whole of the property identified as Tax Map 91, Parcel 103.00 – the same way it was held by Mr. Hobbs and in the same manner as held by the subsequent high bidder at the 2013 re-sale. Thus, because Rose and Davis ultimately agreed to purchase both the Park and the Apartments, it is irrelevant whether the parcels existed as separate parcels at the time of the auction.

If Rose and Davis saw the lack of a dividing line between the properties as a defect, they should have raised the issue promptly with the trial court and requested early on that the Special Commissioner retain a surveyor to set the dividing line between the Apartments and

the Park through a court partition survey. As noted in *Rogers*:

> [W]here rescission was asked upon the ground of a defective title the vendor would be allowed a reasonable time to perfect his title, and, if the after-acquired title be a good one, and there is no fraud, the complainant will be compelled to accept it.

*Id.*, 92 S.W.2d at 429. Accordingly, this issue lacks merit.

## Driveway

Rose acknowledged at the May 2012 hearing that the revision date on Mr. Mize's survey was April 8, 2010, and that the revised survey of Rose and Davis's properties showed inclusion of the 14-foot parcel from the estate of Mr. Hobbs. Thus, any purported defect pertaining to the driveway's encroachment on Mr. Hobbs's estate was cured by April 2010. The driveway encroachment issue was not a basis upon which Rose and Davis were entitled to relief.

## Tax Lien

Rose and Davis assert that the properties were subject to a large federal tax lien that was not paid until February 8, 2010, nearly a year and a half after the original contracts were signed. Therefore, they argue that as of the date of the order of confirmation, the properties were not free and clear of liens and could not thereby be conveyed by warranty deed as represented at the auction.

In the trial court's order of confirmation, it is stated

> IT IS FURTHER ORDERED that when said purchase money for a particular parcel and/or interest . . . should be paid to the Clerk and Master, and all related costs shall have been paid, the Clerk and Master, upon a purchaser's request, shall make, acknowledge for registration, and deliver to such purchaser a deed conveying the tract of land to such purchaser (or such purchaser's designee) free of any claim or lien . . . ; the subject parcel of the real property shall be released from all such claims and liens upon payment of the purchase money for said parcel and to the extent such claims and liens may be found to be valid, the same shall be satisfied and released. . . .

IT IS FURTHER ORDERED that when said purchase money should be paid to the Clerk and Master . . . the Clerk and Master shall secure the release of any claim of the Internal Revenue Service against said parcel with respect to estate taxes due from the Herbert Hoover Hobbs Estate.

Tennessee courts recognize the right of sellers to be given an opportunity to remedy any defects in title after execution of sales contracts. *Rogers*, 92 S.W.2d at 429. Payment to satisfy the lien was made on February 8, 2010, pursuant to the court's order and out of proceeds from the 2009 sales of other properties by the Special Commissioner. "The purchaser is entitled to have all tax liens . . . or other encumbrances on the property, removed, or else discharged out of the purchase-money paid by him into Court." Henry R. Gibson, et al., Gibson's Suits in Chancery § 18.20 (8th ed., 2004). Accordingly, any defect was cured and the title was free and clear of the IRS lien as of the time Rose and Davis filed their motions to set aside the sales contracts. The trial court properly determined that the tax lien did not serve as a basis for relieving the pair of their obligation to close on the properties.

## Judicial Sale

Rose and Davis point to what they perceive to be differences in the procedures used in the original 2009 and the 2013 re-sale. They claim that the 2009 sale should have been conducted like the 2013 re-sale.

Judicial sales are treated differently than private sales. As we have recognized:

The court should not and will not permit interference with the orderly process of the court through its clerks or other officers in carrying out the terms and provisions of its decrees. To permit such tampering with the processes and procedure of the court as would authorize persons to bid at judicial sales who did not know whether they would comply with the terms of sale or not . . . would be opening the door to fraud and deceitful interference with persons who might be present and interested in purchasing the property to be sold, and create a sentiment in the minds of the public which would destroy, not only the orderly procedure of such action in pending causes, but which would create a disrespect for the court itself.

*Matthews*, 292 S.W.2d at 549.

If Rose and Davis had been willing to follow through with the sales contracts, the Special Commissioner and the court could have worked to allay their fears regarding the

-15-

perceived "defects." Any request to have deeds prepared for two separate parcels could and would have been honored – just as was done with the 2013 re-sale. However, by September 2010, Rose had decided he wanted out of the transaction and roughly one year after the auction, and at least six months before the motion to set aside the sale contracts was filed, Davis likewise had lost interest in purchasing the properties. Granting relief to Rose and Davis under the circumstances of this case would be improper, as they did not timely pursue their rights pursuant to the rules.

## **Damages**

Rose and Davis contend that any damages they owe consist of the earnest money paid. They assert the contracts contain a clear and unequivocal liquidated damages provision that the earnest money would be forfeited if closing did not occur within approximately 30 days after being presented the deed to the parcel:

> It is further agreed that if purchaser fail (sic) to carry out and
> perform the terms of this agreement after deed is presented, then
> the above deposit money shall be forfeited as damage to this sale
> and shall be retained by the Chancery Court subject to orders of
> the Court.

The appellees contend the language regarding the deposit money exists merely to advise the purchasers of how their deposit money of ten percent will be applied and that their deposit money will not be returned to them.

In Tennessee, "[t]he term "liquidated damages" is defined by case law as a "sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur." *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn. 1980); *Kimbrough & Co. v. Schmitt*, 939 S.W.2d 105, 108 (Tenn. Ct. App.1996). The stipulated amount represents an estimate of potential damages in the event of a contractual breach where damages ***are likely to be uncertain*** and ***not easily proven***. *V.L. Nicholson*, 595 S.W.2d at 484 (emphasis added). As argued by the appellees, a "liquidated damages clause purporting to limit [one's] liability for breach of contract . . . [is] unenforceable where the actual damages caused by a breach are 'readily susceptible to accurate proof.'" *Gross v. McKenna*, No. E2005-02488-COA-R3-CV, 2007 WL 3171155, *5 (Tenn. Ct. App. Oct. 30, 2007).

In this case, actual damages caused by the breach by Rose and Davis, such as costs associated with the re-sale (i.e., commissions paid to the auctioneer and the Special

Commissioner), advertising costs, and the difference between the original purchase price and the purchase price at the re-sale, were readily susceptible to accurate proof, even before the 2013 re-sale. *See* Gibson's Suits in Chancery §688.[8] We note that the costs associated with the September 2009 sale alone exceeded the amount of the ten percent deposit (five percent commission to the auctioneer and a six percent commission to the Special Commissioner). There is no indication that any forfeited deposit monies would cover any damages sustained by the Hobbses. Rather, the deposits were to be retained by the court.

The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. *Chambliss, Bahner & Crawford v. Luther*, 531 S.W.2d 108 (Tenn. Ct. App. 1975), and *Hawkins v. Reynolds*, 467 S.W.2d 791 (Tenn. Ct. App. 1971). In order to place the non-breaching appellees, the Hobbses, in "as nearly as possible . . . the same position [they] would have been in had the contract[s] been performed," then the court must not limit the damages to the deposit money. As recognized by Gibson's Suits in Chancery,

> When a person bids at a Chancery sale, he thereby submits himself to the jurisdiction of the Court as to all matters connected with such bid; and ***if his bid is accepted by the Master before it is withdrawn, and is reported and confirmed, the Court may by attachment compel the purchaser to complete his purchase, by paying the purchase-money; or may order a re-sale of the property and issue an execution against him and sureties, if any, for any loss caused by the re-sale . . . .***

Henry R. Gibson, et al., Gibson's Suits in Chancery § 688, at p. 745 (5th ed., 1956) (emphasis added) (citing *Allen v. East*, 63 Tenn. 308 (1874) (upholding a trial court's decree against a high bidder for the deficiency between his bid amount and the re-sale price)); *Matthews*, 292 S.W.2d at 549. *See also* Henry R. Gibson, et al., Gibson's Suits in Chancery § 18.12 (8th ed., 2004). Accordingly, the trial court properly assessed damages against Rose and Davis for the difference between their 2009 bids and the 2013 bid at the re-sale, plus the costs incurred during the 2013 re-sale, with a credit for the deposits tendered by Rose and Davis in 2009.

---

[8]We find the cases cited by Rose and Davis that do not pertain to judicial sales of realty are inapplicable in this matter. *Covington v. Robinson*, 723 S.W.2d 643, 644 (Tenn. Ct. App. 1987); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 91-92 (Tenn. 1999).

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the quasi-parties/appellants, David L. Rose and J. Rickey Davis, and their surety, if any, for which execution may issue, if necessary.

_____
JOHN W. McCLARTY, JUDGE