# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 2, 2022 Session

## HOUSTON HUMPHREYS LLC v. HOUSTON STREET PARTNERS, LLC ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 20-0898-IV      Russell T. Perkins, Chancellor**

———————————————————

**No. M2021-00235-COA-R3-CV**

———————————————————

This appeal concerns the purchase and sale agreement for a 98,094-square-foot, multi-use commercial development in Nashville, Tennessee, known as Houston Station. Before marketing the property for sale, the defendant-seller discovered that approximately 100 square feet of the building encroached on neighboring property owned by CSX Transportation, Inc. and sought a lease from CSX to cover the encroachment. But before it could reach an agreement with CSX, the seller agreed to sell the property to the plaintiff-buyer. The buyer deposited $3 million as earnest money, and the parties scheduled a closing. Before closing, however, CSX demanded $550,000 per year for the encroachment. The seller then informed the buyer that it could not meet its obligations under their agreement. Meanwhile, the seller breached the agreement by executing two new leases without the buyer's approval. The buyer extended the closing several times to allow the seller to cure its defaults, but the seller refused to terminate the new leases and could not reach a mutually agreeable arrangement with CSX. The buyer then let the closing deadline lapse and sued for, *inter alia*, reformation of the purchase agreement, specific performance, and damages. The seller then moved for summary judgment and requested an award of the earnest money on the theory that the buyer waived its objections by allowing the closing deadline to lapse. The trial court granted the motion, reasoning that the buyer had constructive notice of the encroachment and then breached the purchase agreement by failing to buy the property. Accordingly, the court found the seller was entitled to the $3 million deposit as liquidated damages and an award of attorneys' fees and expenses under the agreement as the prevailing party. The buyer appeals. Following a thorough review, we respectfully disagree that the buyer had constructive notice that the seller did not have good and marketable title. We also disagree that the seller had a right to terminate the contract and receive the earnest money. Thus, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Vacated in Part, and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Peter C. Sales and Edmund S. Sauer, Nashville, Tennessee, and Bradley J. Hamburger, Dione Garlick, James P. Fogelman, and Daniel R. Adler, Los Angeles, California, for the appellants Houston Humphreys, LLC.

Ryan T. Holt, Andrea J. Sinclair, Amy K. R. Mohan, Alice E. B. Haston, and Mark A. Carver, Nashville, Tennessee, for the appellees, Houston Street Partners, LLC; Humphreys Street Investments, LLC; and Gordon Gilbreath.

# OPINION

## FACTS AND PROCEDURAL BACKGROUND

### I. BACKGROUND

In the early 1900s, a large factory ("the Houston Station Building") was constructed on a 1.53-acre, triangular piece of land ("the Houston Station Parcel") at 434 Houston Street in Nashville, Tennessee. Around the same time, a 13-foot wide, 0.18-acre strip of the Houston Station Parcel was conveyed to the neighboring railway in exchange for the railway's agreement to build a side track. The conveyance was recorded in a 1903 Deed ("the 1903 Deed") that depicted the conveyed area as a darkened strip between the remaining land and the railway's preexisting, 50-foot right-of-way:



One hundred years later, in 2005, Houston Street Partners, LLC ("Seller"), purchased the Houston Station Parcel and Building. Seller then obtained a land survey ("the 2006 Survey") that showed the parcel was 1.35 acres[1] in size and revealed that the southeast corner of the Houston Station Building encroached onto a "13′ USE EASEMENT" on the railway's property, which was now owned by CSX Transportation, Inc. ("CSX"):



Over the next several years, Seller transformed the Houston Station Building into a mixed-use development and executed leases with several tenants, including one of Nashville's most popular restaurants, Bastion, whose lease included the corner of the Building that encroached on CSX's property ("the CSX Parcel"). Believing it had permission to use the CSX Parcel, Seller allowed its tenants to use the strip of land as an access road for deliveries, trash pickup, and employee parking.

In December 2018, CSX sent Seller a cease-and-desist letter demanding Houston Station tenants stop using its property. Because the CSX Parcel was the only means of access to the rear of the Houston Station Building, Seller's Chief Partner, Gordon Gilbreath, asked CSX for permission to use the Parcel for limited purposes. CSX responded by asking Mr. Gilbreath to submit a land lease application to cover the requested uses and the "~9 feet of the corner of the building . . . encroaching on CSX's property."

---

[1] On page one we identified the acreage as being 1.53 but here it is listed as 1.35. Although this may appear to be a typographical error, it is not. The lot comprised 1.53 acres before the 1903 conveyance to the railroad. Since that time, the acreage has been 1.35.

While Mr. Gilbreath was preparing the lease application, Seller engaged real estate broker Chad Grout to sell the Houston Station Parcel and two nearby parking lots owned by Humphreys Street Investments, LLC. Mr. Grout then notified real estate investment firm Rubicon Equities ("Buyer") that the properties were for sale.[2] Mr. Grout provided Buyer with a copy of the 2006 Survey and disclosed that Seller was negotiating a "parking lease with CSX for the north side of the building."

After some negotiation, Buyer and Seller executed a purchase and sale agreement ("the Purchase Agreement") in December 2019. The Purchase Agreement was structured to provide Buyer with a 45-day inspection period, during which Seller would obtain and provide Buyer with a title insurance commitment, and Buyer would obtain a new survey of the properties. Seller represented that it had "good and marketable title" to the Houston Station Parcel and disclosed that it was "negotiating with CSX railroad . . . regarding the right . . . to use certain property located in the CSX right-of-way for access, parking, a ramp, loading area, and barriers."

After signing the Purchase Agreement, Buyer deposited $1.5 million in earnest money, and Seller provided Buyer with a title commitment from Fidelity National Title Insurance Company along with copies of all title documents referenced there. But none of the materials referenced the 1903 Deed or the encroachment. Buyer then had a new survey prepared based on the title materials that Seller provided. Because those materials did not reference the 1903 Deed, the resulting survey depicted the Houston Station Parcel in its pre-1903, 1.53-acre size and did not reveal the encroachment:



---

[2] The plaintiff-appellant in this case, Houston Humphreys LLC, is Buyer's successor in interest.

Both Buyer and Seller received a copy of the survey in January 2020. A few weeks later, the inspection period closed, and Buyer deposited another $1.5 million in earnest money.

The next month, Mr. Gilbreath received a proposed land lease from CSX for $550,000 per year to use the CSX Parcel for, among other things, "the location and maintenance of a portion of [Seller]'s building." Mr. Gilbreath sent the lease and a copy of the 1903 Deed to Buyer. In his email, Mr. Gilbreath acknowledged that the lease terms were "way out of bounds" and suggested that the parties negotiate for a lower price. Buyer, however, was more concerned that a portion of the Houston Station Building encroached on CSX's property—a fact that Buyer claimed it was unaware of until then. Buyer rejected the idea of leasing the CSX Parcel at any price because it could not "allow . . . anyone else to own the land underneath the building." In response, Mr. Gilbreath admitted that he failed "to recognize the scope and importance" of the encroachment. Mr. Gilbreath explained that Seller had no issues with lenders or title insurance underwriters in the past, and he presumed the lease would resolve any encroachment issues.

A few days later, Buyer sent Seller a "Notice of New Objection" pursuant to § 3.2(a) of the Purchase Agreement. Section 3.2(a) gave Buyer the right to object to newly discovered title defects before closing:

> In the event that at any time following delivery of the Title Commitment or Survey described above, but prior to Closing, any changes . . . occur in the Title Commitment or Survey, in addition to other remedies permitted pursuant to this Agreement, then Buyer, in Buyer's sole discretion and judgment, may: (a) accept the Property with such defects, or (b) give written notice to Seller and the Title Company of Buyer's disapproval of any such matters (a "New Objection"). If Seller does not remove or cure such New Objection prior to the date of Closing, Buyer may at Buyer's election either (i) extend the Closing date by up to thirty (30) days during which time Seller shall correct the New Objection if caused by or through the action or inaction of Seller, and if not then corrected, or [sic] (ii) exercise Buyer's remedies provided in Section 10.1 herein.

Buyer demanded Seller cure the encroachment by acquiring title to the CSX Parcel and extended the closing to July 6, 2020.

Meanwhile, several Houston Station tenants decided not to renew their leases due to pandemic-related declines in business. Losing tenants presented a challenge for Seller because §§ 4.1 and 4.2(a) of the Purchase Agreement obligated Seller to operate Houston Station in the ordinary course of business but prohibited Seller from entering "into any New Lease . . . without the prior written approval of Buyer." Seller identified several potential new tenants but could not get Buyer's approval before executing the leases. Afraid of losing its opportunity to rent the vacant spaces, Seller executed two new leases

in mid-June 2020. When Seller notified Buyer about the leases, it also informed Buyer that "multiple closing conditions"—including "the encroachment issue with CSX"—would not be "satisfied or resolved prior to closing." In response, Buyer sent Seller a notice of default and demanded that Seller terminate the new leases and acquire title to the CSX Parcel.

Predictably, the parties did not close on July 6, 2020. That same day, Buyer sent Seller a "Notice of Closing Date Extension" pursuant to § 6.2 of the Purchase Agreement, which gave Seller the right to extend the closing by 60 days if Seller could not meet the closing conditions:

> In the event any of the foregoing conditions is not satisfied at the time the Closing is scheduled to take place, Buyer may (i) extend the Closing by not more than sixty (60) days to allow Seller to cure such breach of a Condition to Close, and/or (ii) in addition to any other remedy available to it hereunder, terminate this Agreement by written notice to Seller whereupon the Earnest Money shall be promptly refunded to Buyer . . . .

Buyer also reasserted its demands that Seller obtain title to the CSX Parcel and terminate the new leases. Seller, however, refused to terminate the leases and informed Buyer that the encroachment issue would not be cured even with the extended deadline.

Even so, on July 24, 2020, Seller made one last attempt to reach an agreement with CSX by offering to purchase the CSX Parcel for $375,000. In its offer, Seller explained that buying the land "would be the simplest solution to removing the cloud" on its title. CSX, however, was uninterested in selling the property. After CSX declined its offer, Seller informed Buyer a third time that it could not recertify the representations and warranties in the Purchase Agreement because it did not have "good and marketable" title to the Houston Station Parcel.

On September 4, 2020, the rescheduled closing date, Buyer notified Seller that it had three days to cure the defaults before Buyer pursued its remedies under § 10.1 of the Purchase Agreement. Section 10.1 gave Buyer the right to obtain specific performance or terminate the Purchase Agreement if Seller failed to sell the properties:

> 10.1. <u>Seller's Failure to Close/Buyer's Remedies</u>. If Seller fails or is unable to sell the Property to Buyer, then, unless Seller cures such failure within three (3) business days after Buyer provides written notice thereof, Buyer, as its sole and exclusive remedies, may either: (i) obtain specific performance of this Agreement, or (ii) terminate this Agreement without further liability to the Seller, provided that Buyer shall have the right to receive reimbursement of Buyer's actual out-of-pocket costs and expenses in conjunction with this Agreement, not to exceed One Hundred Thousand and

No/100 Dollars ($100,000.00), in which event the Earnest Money shall also be distributed to Buyer.

In response, Seller sent Buyer a notice claiming that Buyer was in default for failing to purchase the properties and giving Buyer three days to cure the default before Seller exercised its rights under § 10.2 of the Purchase Agreement. Section 10.2 gave Seller the right to terminate the Agreement and keep the earnest money as liquidated damages if Buyer defaulted by failing to purchase the properties:

> 10.2. <u>Buyer's Failure to Close/Seller's Remedies</u>. If Buyer fails to purchase the Property and such failure constituted a default under this Agreement, then, unless Buyer cures such failure within three (3) business days after Seller gives it written notice thereof, Seller, as its sole and exclusive remedy, may terminate this Agreement and receive the Earnest Money as full and agreed upon liquidated damages.

Shortly after that, Buyer commenced this action by filing a complaint for reformation of the Purchase Agreement, specific performance, and damages against Seller, Mr. Gilbreath, and John Does 1–3 (collectively, "Defendants"). After Buyer filed its complaint, Seller notified Buyer that it was terminating the Purchase Agreement and retaining the $3 million in earnest money as liquidated damages.

## II. TRIAL COURT PROCEEDINGS

Buyer asserted six claims against Defendants, only four of which are at issue on appeal: (1) reformation of the Purchase Agreement based on fraud; (2) specific performance of the reformed Purchase Agreement; (3) breach of contract; and (4) fraudulent concealment.[3] In short, Buyer alleged that Defendants fraudulently induced Buyer to enter the Purchase Agreement by misrepresenting and concealing the actual size of the Houston Station Parcel and misrepresenting the quality of its title, that it had good and marketable title. Thus, Buyer asserted that it was entitled to an abatement of the purchase price or an award of damages to reflect the smaller parcel size and the legal risks associated with the encroachment. Buyer also sought an award of damages to compensate for the allegedly inferior leases that Seller entered into without Buyer's permission.

Defendants responded by moving for summary judgment on all claims. Defendants argued that they were entitled to summary judgment on Buyer's fraud claims because the

---

[3] Buyer also asserted a claim against Seller for injunctive relief and a claim against Gordon Gilbreath and John Does 1–3 for violation of the Tennessee Consumer Protection Act ("TCPA"). The trial court granted summary judgment to Seller on these claims, and Buyer has not appealed that part of the court's judgment.

actual boundary line and encroachment were disclosed on the 2006 Survey that Mr. Grout provided to Buyer in October 2019. Defendants also asserted that Buyer had constructive notice of the boundary line because the 1903 Deed was a public record. Thus, Defendants asserted that Buyer was not entitled to an abatement of the purchase price or damages. As for Buyer's claims for breach of contract and specific performance, Seller asserted that it was entitled to summary judgment because the Purchase Agreement terminated after Buyer failed to close. Defendants also asked the court to release the earnest money to Seller and award reasonable attorneys' fees. Buyer opposed the motion, arguing that it had no constructive notice and that there were multiple triable issues preventing summary judgment.

Following a hearing, the trial court granted Defendants' motion for summary judgment, awarded the earnest money to Seller as liquidated damages, and awarded $350,000 in attorneys' fees and costs to Seller as the prevailing party. The court found that Buyer had constructive notice of the actual boundary line, the encroachment, and the 1903 Deed, and that Seller "was capable of conveying good and marketable" title to "the Property as defined in the Agreement," being "the land that ends where CSX's property begins." For these reasons, the court concluded that Defendants were entitled to summary judgment on Buyer's claims for reformation and fraudulent concealment. The court also found that Seller was "ready, willing and able to convey the Property, as defined in the Agreement" and that Seller's termination of the Purchase Agreement was valid. Thus, the court reasoned that Buyer could not suffer damages from Seller's alleged breaches of the contract, and it found Seller was entitled to the earnest money as liquidated damages. Because Defendants were the prevailing party, the court awarded them $350,000 in attorneys' fees and costs under the Purchase Agreement.

This appeal followed.

**ISSUES**

Buyer raises four issues on appeal:

1. Did the trial court err in concluding, as a matter of law, that Seller had not actually agreed to sell all of Houston Station to Buyer and therefore was entitled to summary judgment on the Buyer's contract claims?

2. Given that Tennessee courts have long held that constructive notice is not a defense against fraud, did the trial court err in granting summary judgment on Buyer's fraud-based claims on the theory that Buyer had constructive notice of the true boundary line of the Houston Street parcel?

3. Is there a genuine issue of material fact precluding summary judgment on Buyer's fraud-based claims regarding whether Seller disclosed the true boundary line when it made available an outdated, inaccurate survey

completed in 2006 that, according to unrebutted expert testimony, no reasonable buyer would rely on?

4. Did the trial court err in awarding Buyer's deposit to Seller, even though Seller had (a) asserted no claim to the deposit and (b) by its own admission, not satisfied the closing conditions in the parties' agreement that are a prerequisite for the Buyer's forfeiture of the deposit?

Seller states the issues on appeal as follows:

1. Are Buyer's new arguments on appeal waived?

2. Did the trial court correctly rule that Buyer's fraud claims fail as a matter of law and that Buyer is not entitled to reformation of the contract?

2. Did the trial court correctly grant summary judgment on Buyer's breach-of-contract claims?

3. Are Buyer's objections to the trial court's award of earnest money waived, meritless, or both?

4. Did the trial court correctly award attorneys' fees to Seller as the prevailing party, and is Seller entitled to its attorneys' fees on appeal?

## STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo without a presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, this court must make a fresh determination of whether the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. *Id.* In so doing, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

Courts should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment does not bear the burden of proof at trial, as is the case here, it "may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264.

When a party moves for summary judgment and supports the motion as required by Tennessee Rule of Civil Procedure 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265. Instead, the nonmoving party must respond with specific facts showing there is a genuine issue for trial. *Id.* A fact is material "if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). A "genuine issue" exists if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

**ANALYSIS**

I. CLAIMS FOR REFORMATION AND FRAUDULENT CONCEALMENT

Buyer contends that the trial court erred in granting summary judgment on its claims sounding in fraud because there is a genuine issue of material fact as to whether the 1903 Deed and the 2006 Survey constituted actual or constructive notice of Seller not having the right to use all the land under the Houston Station Building.[4] We agree.

To establish fraudulent concealment, a plaintiff must prove that "the defendant ha[d] a duty to disclose a known fact, the defendant faile[d] to disclose that fact, and the plaintiff reasonably relie[d] on the resulting misrepresentation, which cause[d] injury." *Archer*, 2020 WL 6075705, at *6 (citations omitted). "[A] seller of real property has a duty to disclose 'a fact of controlling importance in determining the desirability and value of that [real property].'" *Homestead Grp., LLC v. Bank of Tennessee*, 307 S.W.3d 746, 752 (Tenn. Ct. App. 2009) (quoting *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947)). That said, there is no duty to disclose a fact "where ordinary diligence would have revealed the undisclosed fact." *Odom v. Oliver*, 310 S.W.3d 344, 350 (Tenn. Ct. App. 2009) (citing *Simmons*, 206 S.W.2d at 296; *Lonning v. Jim Walter Homes, Inc.*, 725 S.W.2d 682, 684 (Tenn. Ct. App. 1986)).

---

[4] Buyer also contends that the doctrine of constructive notice is not a defense to fraud under the circumstances of this case. Defendants argue that Buyer waived this argument by not raising it in the trial court. We agree. "Constructive notice" refers to "information or knowledge of a fact imputed by law to a person . . . because he could have discovered the fact by proper diligence." *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 15 (Tenn. 1997) (quoting *Kirby v. Macon Cnty.*, 892 S.W.2d 403, 409 (Tenn. 1994)). Generally, plaintiffs "cannot recover on a claim of misrepresentation or concealment when the plaintiff has constructive knowledge of the material fact at issue." *Archer v. The Home Team, Inc.*, No. M2019-01898-COA-R3-CV, 2020 WL 6075705, at *7 (Tenn. Ct. App. Oct. 15, 2020) (citing *Winstead v. First Tennessee Bank N.A., Memphis*, 709 S.W.2d 627, 633 (Tenn. Ct. App. 1986)). There are exceptions to this rule, such as when the defendant's representations were "calculated to lull the suspicions of a careful man into a complete reliance" or when the defendant prevented or hindered the plaintiff's efforts to investigate and discover the truth. *Id.* (quoting 92 C.J.S. Vendor and Purchaser § 68). In the trial court, Buyer disputed whether the 1903 Deed was discoverable through proper diligence, but Buyer did not argue that any exception to the general rule applied. Thus, the issue is waived.

- 10 -

Generally, whether a fact would have been discoverable in the exercise of ordinary diligence is a question of fact. *See id.* at 352 (finding a factual dispute regarding whether the buyers could have discovered a defect in the exercise of ordinary diligence). Publicly recorded information, however, is "discoverable through ordinary diligence" as a matter of law. *See Archer*, 2020 WL 6075705, at \*7 (citing *PNC Multifamily Cap. Inst'l Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012); *Trent v. Mountain Com. Bank*, 606 S.W.3d 258, 265 (Tenn. 2020)); *see also* Tenn. Code Ann. § 66-26-102 (providing that all recorded instruments such as deeds and judgments "shall be notice to all the world from the time they are noted for registration, . . . and shall take effect from such time.").

It is undisputed that the 1903 Deed was registered with the Davidson County Register's Office. It is also undisputed that Seller gave Buyer a copy of the 2006 Survey, which referenced the 1903 Deed by book and page number. The 1903 Deed shows that a 13-foot strip of the Houston Station Parcel bordering the railway's right-of-way was conveyed to CSX's predecessor. Thus, as a matter of law, Buyer had constructive notice of the facts contained in the 1903 Deed.

As such, we agree with the trial court that Buyer had constructive notice that CSX owned a strip of land between the Houston Station Parcel and the railway. However, the 1903 Deed did not provide Buyer with constructive notice that the Houston Station Building encroached on CSX's property because the 1903 Deed did not show or describe the Building's location.

To establish that Buyer had notice of the encroachment, Defendants relied on the 2006 Survey. It was undisputed that Mr. Grout gave Buyer a copy of the Survey in October 2019 and that the Survey showed the southeast corner of the Houston Station Building encroaching on the CSX Parcel. Thus, we agree with the trial court's conclusion that Buyer had constructive notice that the Houston Station Building encroached on the CSX Parcel.

That said, it was also undisputed that the 2006 Survey showed a 13-foot "use easement" covering the encroachment and that Defendants themselves mistakenly believed they had a right to use the easement for at least 12 years.[5] For this reason, viewing these

---

[5] Defendants contend that Buyer waived any argument concerning the use easement because "Buyer neither pled in its complaint nor argued to the trial court that it was defrauded by an alleged false disclosure of a use easement." This argument is misplaced. As Defendants correctly point out, Buyer does not contend that it was defrauded by Defendants' failure to disclose the use easement; Buyer contends that it was defrauded by Defendants' failure to disclose the unauthorized encroachment of the Houston Station Building on the CSX Parcel. The use easement rebuts Defendants' contention that the 2006 Survey gave Buyer actual or constructive notice of this fact.

facts in a light most favorable to Buyer, we disagree with the trial court's conclusion that it is undisputed Buyer had actual or constructive notice of the encroachment being unauthorized. To the contrary, we find that it is disputed whether Buyer had sufficient notice that the encroachment was unauthorized by CSX. We also find this disputed fact material because the unauthorized encroachment of a building on adjoining property exposes the landowner to liability. *See Cross v. McCurry*, 859 S.W.2d 349, 354 (Tenn. Ct. App. 1993) (holding that landowner was entitled to damages when neighboring building encroached on property). Thus, "[s]uch an encroachment makes the title of the purchaser unmarketable because the adjoining owner may compel the removal of the encroachment or sue for damages caused by it." 77 Am. Jur. 2d Vendor and Purchaser § 164; *see also Rogers v. Roop*, 92 S.W.2d 423, 429 (Tenn. Ct. App. 1935) (defining "merchantable" or "marketable" title as "title free from serious defects, evidenced by public record and in no way dependent upon parol evidence, and that nothing appears casting a cloud upon it from which litigation can arise").

Buyer seeks reformation of the Purchase Agreement and damages for Defendants' alleged misrepresentation of the Houston Station Parcel's size and the quality of its title, i.e., that Seller had "good and marketable" title to the property. In particular, Buyer sought an abatement of the purchase price to account for the legal risks associated with the unauthorized encroachment. It was undisputed that Seller knew the encroachment was an issue with CSX by early 2019 when CSX demanded Seller submit a land lease application to cover various uses, including the approximately "9 feet of the corner of the building . . . encroaching on CSX's property." Yet six months later, Seller negotiated a contract to sell the Houston Station Parcel based on representations that it owned "good and marketable title." Seller later admitted that it could not live up to this representation due to the encroachment. Neither the 2006 Survey nor the 1903 Deed establishes that Buyer knew or should have known that the encroachment clouded the title to the Houston Station Parcel.

For these reasons, Defendants are not entitled to judgment as a matter of law on Buyer's claims for reformation and fraudulent concealment.

## II. CONTRACT-BASED CLAIMS

Buyer contends that the trial court erred when it granted summary judgment to Seller on its contract-based claims for several reasons. As stated in its brief,

> The Seller admitted, among other things, that it could not live up to its end of the bargain—specifically, that it could not convey all 1.53 acres of Houston Station because CSX owned [a portion] of it. It had also entered into dubious leases without the Buyer's approval, in violation of the parties' agreement. The Seller breached the agreement in other ways, too, including

- 12 -

by not disclosing CSX's threat of a trespass suit. All of these contractual breaches were either admitted or are beyond dispute, which means that the Seller was in no position to close on the deal. The trial court nonetheless declared that the *Buyer* had defaulted by not going through with the purchase and that the agreement had been terminated. . . . That conclusion is entirely divorced from the evidentiary record.

Buyer also contends that Seller had no right to terminate the contract or keep the earnest money because Buyer's failure to close was not a default under the Purchase Agreement. Buyer asserts that its obligation to close was conditioned on, among other things, Seller not being in default and Seller's representations being true, accurate, and complete. Because Seller admitted to breaching § 4.2 of the Agreement, Buyer contends that Seller did not meet the closing conditions and thus Buyer had no obligation to close.[6]

For its part, Seller argues that Buyer's failure to close was a default because Buyer opted to proceed to closing rather than terminating the Purchase Agreement after Seller admitted that it could not meet the closing conditions.

Resolving these issues requires interpretation of the Purchase Agreement. We review a trial court's interpretation of a contract de novo without a presumption of correctness. *See State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004).

The trial court based its decision to grant summary judgment on Seller's purported termination of the Purchase Agreement under § 10.2. This section gave Seller the right to terminate the contract and retain the earnest money as liquidated damages if Buyer failed to close and its failure to close constituted a default:

> 10.2. <u>Buyer's Failure to Close/Seller's Remedies</u>. If Buyer fails to purchase the Property and such failure constituted a default under this Agreement, then, unless Buyer cures such failure within three (3) business days after Seller gives it written notice thereof, Seller, as its sole and

---

[6] Buyer also contends that summary judgment and the award of damages was not appropriate because "there was at least a triable question whether the Seller had breached the agreement by failing to disclose a threat of legal action by CSX" and because Seller's request for an award of the earnest money was procedurally improper. Defendants argue that Buyer waived these arguments by not making them in the trial court. We agree. Arguments not first raised in the trial court are waived on appeal. *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006). Additionally, "[a] skeletal argument that is really nothing more than an assertion will not properly preserve a claim . . . ." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) (citing *United States v. Dunkel*, 927 F.2d 942, 956 (7th Cir. 1991)). Buyer did not oppose Seller's claim for liquidated damages on procedural grounds in the trial court. Further, Buyer's complaint did not allege that Seller breached its obligation to disclose threatened litigation, and Buyer made only a passing reference to this allegation in its oral argument to the trial court.

exclusive remedy, may terminate this Agreement and receive the Earnest Money as full and agreed upon liquidated damages.

At the same time, as Buyer correctly points out, § 6.2 conditioned Buyer's obligation to close on, among other things, "Seller not being in default under [the] Agreement" and "all of the representations and warranties made by Seller . . . being true, accurate and complete." But Seller relies on additional language in § 6.2 that gives Buyer the right to extend the closing or terminate the contract:

> In the event any of the foregoing conditions is not satisfied at the time the Closing is scheduled to take place, Buyer may (i) extend the Closing by not more than sixty (60) days to allow Seller to cure such breach of a Condition to Close, and/or (ii) in addition to any other remedy available to it hereunder, terminate this Agreement by written notice to Seller whereupon the Earnest Money shall be promptly refunded to Buyer and . . . then Seller shall reimburse Buyer for its actual and documented out-of-pocket costs and expenses not to exceed $100,000.

Buyer alleges that Seller breached the Purchase Agreement by "failing to own good and marketable fee simple title to the Property." The trial court found it undisputed that "Seller[] owned good and marketable fee simple title to the Property as defined in the Agreement," which the court construed as "land that ends where the CSX Parcel begins." Buyer contends this interpretation is incorrect because Seller agreed to sell "the full property and building, including the portion owned by CSX."[7]

We agree with the trial court's conclusion that Seller owned fee simple title to "the Property" as defined in the Purchase Agreement. The Purchase Agreement, through a series of defined terms, identifies "the Property" as including the "Houston Station Parcel," which the Agreement defines as an "approximately 1.53-acre parcel of land in Nashville, Davidson County, Tennessee with an address of 434 Houston Street and a Tax Parcel Identification of 10503019800 as more particularly described on Exhibit A-1." Exhibit A-1 "more particularly" describes the Houston Station Parcel as follows:

> Land in Davidson County, Tennessee, being a triangular shape lot in South Nashville, **fronting on the west side of the N.C. & St. L. Railroad**, and being bounded on its westerly side by Brown Street, and on its southerly side by Houston Street; said lot has a frontage on Brown Street of 280 feet, and

---

[7] In the alternative, Buyer contends that the Purchase Agreement is ambiguous as to what the parties agreed to buy and sell. Seller argues that Buyer waived this argument by failing to raise it in the trial court. We agree. Buyer did not argue that the Purchase Agreement was ambiguous in the trial court and, as such, waived the issue on appeal. *See Barnes*, 193 S.W.3d at 501.

on Houston Street of 512 feet; said lot being a part of the Humphrey Houston and Martin Plan of lots as registered in Book 36, page 117, in the Register's Office for Davidson County, Tennessee.

.    .    .    .    .

Being **the same property conveyed** to Houston Street Partners, LLC, a Tennessee limited liability company, by Thomas T. Pennington and Jeffrey A. Kay, Co-Trustees of the Rich Trust by Special Warranty Deed dated November 23, 2005, of record at Instrument No. 20051128-0143055, Register's Office for Davidson County, Tennessee.

(Emphasis added). Thus, the Purchase Agreement obligated Seller to convey what it received in 2005: the triangular parcel of land bounded by Brown Street, Houston Street, and the railroad. It is undisputed that Seller still owned all the property it received in 2005.

While we agree that Seller owned fee simple title to "the Property," we respectfully disagree with the trial court's conclusion that Seller owned "good and **marketable** fee simple title to the Property." As discussed, the encroachment of a building onto neighboring land "makes the title of the purchaser unmarketable because the adjoining owner may compel the removal of the encroachment or sue for damages caused by it." 77 Am. Jur. 2d Vendor and Purchaser § 164; *see also Rogers*, 92 S.W.2d at 429. It is undisputed that the Houston Station Building's encroachment onto CSX's property created a cloud on Seller's title.

Thus, it is undisputed that Seller could not satisfy the closing conditions at the time of the September 4, 2020 closing date. Seller told Buyer that it could not recertify its representations and warranties because it did not have "good and marketable" title to the Houston Station Parcel. Additionally, Seller does not dispute that it breached the Purchase Agreement by executing two new leases without obtaining Buyer's consent. Nevertheless, Seller contends that Buyer's only options were to extend the closing date, terminate the contract, or proceed with the closing. Because Buyer did not extend the closing date or terminate the contract, Seller argues that Buyer breached its obligation to close. We disagree.

Section 6.2 expressly conditioned Buyer's obligation to close on Seller meeting the closing conditions. We do not interpret Buyer's right to extend closing or terminate the Agreement as abrogating this. *See Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005) (recognizing that the provisions in a contract should be interpreted harmoniously with each other when possible). Simply put, if Seller did not meet the closing conditions by the closing date, Buyer was not obligated to close. In addition, Buyer had the right to extend the closing, terminate the Agreement, or exercise "any other remedy

available" under the Purchase Agreement. Relevant here, § 10.1 gave Buyer the right to seek specific performance.

Thus, when Seller had not satisfied the closing conditions by the September 4, 2020 closing date, Buyer had no obligation to close, and it had the right to seek specific performance, which it did. Because Buyer had no obligation to close, Buyer's failure to close was not a default. Therefore, Seller had no right to terminate the Purchase Agreement and receive the $3 million deposit as liquidated damages.

For these reasons, Seller is not entitled to judgment as a matter of law on Buyer's contract-based claims. This includes the trial court's ruling that the Purchase Agreement terminated upon Buyer's failure to close on September 4, 2020, and its ruling that Seller was entitled to retain the earnest money as liquidated damages. Accordingly, both of the above rulings are vacated.

The above ruling also requires that we vacate the ruling that Buyer could not establish damages based on Seller's admitted breach of § 4.2 of the Purchase Agreement by entering into two new leases after the expiration of the inspection period without Buyer's approval.

## III. ATTORNEYS' FEES

Buyer contends this court should also vacate the award of attorneys' fees and costs because Defendants are no longer the "prevailing parties." Section 11.13 of the Purchase Agreement entitles the "prevailing party" in any action related to the Purchase Agreement to an award of reasonable costs, expenses, and fees. Because we have reversed the trial court's grant of summary judgment in favor of Seller on the breach of contract claims, Seller is not the prevailing party. Therefore, Seller is not entitled to attorneys' fees and expenses at this stage. Accordingly, we vacate this portion of the trial court's judgment.[8]

## IN CONCLUSION

Based on the above, we reverse the trial court's judgment concerning Buyer's claims for reformation and fraudulent concealment, as well as Buyer's contract-based claims, and we vacate its award concerning the earnest money deposit and attorneys' fees and expenses and remand for further proceedings consistent with this opinion. Costs of appeal are

---

[8] Because Buyer did not appeal the summary judgment on its TCPA claim, Defendants contend that the award of attorney's fees should be affirmed in part under Tennessee Code Annotated § 47-18-109(e)(2). We decline to do so. The trial court did not address Buyer's request under § 47-18-109(e)(2), and Buyer's decision to abandon its TCPA claim on appeal does not automatically entitle Defendants to an award under that statute.

- 16 -

assessed against the appellees, Houston Street Partners, LLC; Humphreys Street Investments, LLC; and Gordon Gilbreath, jointly and severally.

_____
FRANK G. CLEMENT JR., P.J., M.S.